

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
09/09/2010

| | | |
|---|---|---|
| IN RE: | § | |
| CHARLES R. SADEN; aka SADEN; fdba POS | § | CASE NO: 10-35051 |
| CARD PROCESSING; dba HEALTH & | § | |
| MEDICAL PLANS; fdba PRECISION | § | |
| PAYMENT COMPANY; dba | § | |
| HOHENSADEN, LLC | § | |
|     Debtor(s) | § | |
| | § | CHAPTER 11 |

## MEMORANDUM FINDINGS AND CONCLUSIONS REGARDING ORDER SUSTAINING U.S. TRUSTEE'S OBJECTION TO ENGAGEMENT OF ATTORNEY (DOC 12, 45)

      In this memorandum, the Court sets out its findings of fact and conclusions of law regarding its order (document # 45) entered on September 2, 2010, denying Debtor's application (document # 12) to engage Baker and Associates ("Counsel") as Debtor's general bankruptcy counsel. In summary, the Court concludes that Counsel is not disinterested because Counsel is a pre-petition creditor and a post-petition creditor under an arrangement requiring Counsel to advance payments on Debtor's secured debt. In addition, the ambiguities in the transfer of real property from Debtor to Counsel immediately pre-petition almost certainly create interests adverse to Debtor and to the estate. By separate written order, the application for engagement of counsel was denied on September 1, 2010.

### BACKGROUND

      The following information is derived from the Court's docket sheet for this case, from Debtor's bankruptcy schedules and statement of financial affairs, and from stipulated facts and exhibits filed by Counsel and the US Trustee at the hearing on the application to engage counsel.

    1. Events Prior to the Filing of the Bankruptcy Petition

        a. The Dispute with Brian Smith

      Several years prior to filing of the petition that commenced this bankruptcy case, Charles Saden ("Debtor") and Brian Smith, engaged in a joint business, providing services to merchants to enable them to accept credit card payments for purchases. Mr. Smith sued Debtor in Texas state court. In that suit (i) the state court judge appointed a receiver for the business and (ii) the jury returned a substantial verdict in favor of Mr. Smith (against Debtor) that Debtor lists in his bankruptcy schedules as a disputed claim for $2,000,000. A judgment has not been entered on the jury verdict. When presented with a motion for entry of judgment, the judge suggested that

the parties go to mediation, which they did, but mediation did not successfully resolve the dispute. Mr. Smith's counsel is currently seeking entry of a judgment on the jury verdict.

### b. The Hockley Property (a/k/a the Farm Property)

Immediately prior to the filing of the petition that commenced this bankruptcy case, Debtor owned about 20 acres of property in Hockley, Texas (the "Hockley Property" also referred to by Counsel as the "Farm Property"). The taxing authorities valued the land at $250,000. David Doty ("Doty") held a claim for about $140,000 secured by a mortgage against that property. These numbers imply that Debtor had equity in the property of about $110,000. The bankruptcy schedules suggest that this is the only non-exempt property that Debtor owned that had substantial equity.[1]

Doty noticed and posted the Hockley Property for non-judicial foreclosure to occur on June 1, 2010. Debtor conferred with Counsel and during the last week of May and the first week in June, Debtor paid Counsel about $5,100 cash. On or about May 28, Counsel obtained a Temporary Restraining Order prohibiting the June foreclosure sale.

On June 1, Debtor and his spouse executed a warranty deed transferring the Hockley Property to Counsel. Counsel then paid Doty $10,000 (apparently from Counsel's own, personal funds) and agreed to make monthly payments on the Doty claim; Counsel and Doty further agreed that the entire note would be due and payable in November, 2010.[2]

Also on June 1, Debtor and Counsel signed an engagement agreement.[3] The agreement provided, among other things:

> You have paid a retainer to the Firm (the "Retainer Amount.").
>
> Further, you and your wife as owners of the Farm Property have conveyed the Farm Property to the Firm by warranty deed as an additional Retainer Amount. You owe approximately $140,000 on the Farm Property to the Lender.
>
> The Firm intends on selling the Farm Property. Upon the sale of the Farm Property, the proceeds of the sale of the Farm Property shall be held by the Firm in its IOLTA account as an additional Retainer Amount.
>
> You will be given credit for an additional Retainer Amount that will be the net amount that the Firm receives on the sale of the Property less amounts paid on or for the Property while owned by Baker.

---

[1] *But see* the discussion below concerning the disputed claim against Brian Smith and the receiver of the business property.
[2] Docket # 12, Exhibit 3 to Counsel's Rule 2016 statement.
[3] Stipulated Exhibit 3.

> … If your bankruptcy case has been completed, closed, or discharged, the Firm may apply funds in its trust account to payment of its fees and expenses without bankruptcy court approval.

The transaction is disclosed in several different places in Debtor's bankruptcy pleadings and forms. Although the warranty deed purports to transfer ownership of the property, other documents, forms, and pleadings (as well as Counsel's statement in open court at the hearing) indicate that the parties intended only to transfer the equity, less certain sums, as a retainer. Apparently none of the documentation between Counsel and Debtor was intended to be taken literally. And the pleadings continue that confusion. In some places the documents seem to transfer full ownership, and in some pleadings Counsel asserts that he has full ownership. But in other documents (and pleadings) Counsel argues that Debtor has retained rights in the property that are only vaguely defined.

The Court concludes that the warranty deed was not intended to convey equitable title to Counsel. The Court concludes that the warranty deed was intended to create a security interest in the property in favor of Counsel to secure all pre-petition and post-petition obligations that Debtor might owe to Counsel and, in addition, to make available to Counsel as a retainer whatever funds remained after sale of the property. An alternative analysis might be that Counsel became the trustee of the property with the right to sell the property, to reimburse himself for expenses, and to hold the balance as his retainer. Counsel's powers in this arrangement far exceed those of a common secured creditor; Counsel had the unfettered right to determine how to market the property, when to sell the property, the price at which to sell the property, and the amount of expenses to which Counsel was entitled to reimburse himself from the sale. The documentation does not require notice of the sale to Debtor (or anyone else), does not require Debtor's agreement to the sale, and does not prohibit Counsel from selling the property to himself or to a related party. Indeed, Counsel's engagement agreement does not explicitly <u>require</u> counsel to sell the property at all. The engagement agreement merely says that Counsel "intends" to sell the property.

From May 11 to June 17, Counsel provided legal services to Debtor for which he invoiced Debtor a little more than $16,000. As noted above, Debtor had paid Counsel about $5,100 cash. Counsel and the US Trustee stipulated that Counsel applied the $5,100 cash to payment of Counsel's invoices. Therefore, on the day that the bankruptcy petition was filed, Counsel had a claim against Debtor for about $10,900 for pre-petition legal services. The various agreements clearly imply, and some explicitly state, that Counsel has a right to retain this sum out of the sales' proceeds of the property.

In addition, Counsel paid Doty $10,000 to delay foreclosure from June 1 through November, 2010, and as further consideration to delay foreclosure Counsel agreed to pay the monthly note payment to Doty. The former is a pre-petition claim against the estate and the latter is an agreement to lend money to the estate during the course of the case, thereby creating post-petition claims. Counsel may incur additional unspecified claims resulting from his ownership of the property, which would also constitute post-petition claims.[4] Counsel believes

---

[4] It is not clear what those expenses might be. The Court questioned Counsel about insurance; it seemed that Counsel had simply not thought about that until asked. He said that he probably would not make a claim for

that he is entitled to recover all of those sums from the sale of the property. The Court concludes that when the bankruptcy case was filed Counsel was a secured creditor of this estate in the amount of approximately $21,000 ($10,000 advanced to Doty and $10,900 unpaid legal fees.)

The property has not yet been sold. Therefore, Counsel remains a secured creditor of the estate for that amount plus additional claims that might arise post-petition such as payment of the monthly note payment to Doty.

2. The Bankruptcy Petition

Debtor filed a voluntary petition commencing this case under chapter 11 of the Bankruptcy Code on June 16, 2010. Debtor's petition indicates that he formerly did business as POS Card Processing, Precision Payment Company, Hohensaden, LLC, and Health & Medical Plans. The chapter 11 petition was filed solely by Mr. Saden; Mrs. Saden is not a debtor in this case.

Debtor's bankruptcy Schedule A lists 3 pieces of real property. The Hockley Property is not listed as property of the estate in schedule A. Debtor's homestead is listed on Schedule A. The homestead is the only property listed on that schedule as worth more than the liens against it.

Debtor's amended schedules indicate that he has no significant cash or other personalty except (i) an alleged claim for $500,000 against Mr. Smith (Debtor's former business associate), Mr. Smith's attorneys, and the state court receiver. (ii) a 2008 GMAC Acadia automobile that Debtor values at about $28,000 and (iii) the retainer held by Counsel which Debtor values at $80,000.[5]

Schedule F lists a disputed claim for $2,000,000 held by Mr. Smith (presumably the jury verdict on which judgment has not yet been entered) and $130,000 in credit card bills. Counsel represented that the credit card bills related in large part to attorneys' fees.

Schedule I reports that Debtor's income is $1,800 per month in unemployment benefits, $300 per month from insurance commissions, and $500 per month from his wife's work as a hair stylist, for a total of $2,607 per month, before taxes. Debtor's monthly operating report for June (covering June 17 through June 30) shows that his income for that one-half month was $186.00. The July monthly operating report shows income of $5,593 but that appears to be a non-recurring number because it includes unemployment benefits of $2,400 (probably representing three checks received in the month instead of 2) and approximately $2,000 for the sale of hay grown on the land that had been transferred to Counsel as Counsel's retainer.[6] Taking out these extraordinary items, the income for July is about what schedule I shows: approximately $3,000.

---

insurance expenses. There are no limitations in the agreement, however, with respect to expenses that Counsel can recover from the property.

[5] The difference between this $80,000 figure and the $110,000 alleged equity in the property is an example of the imprecision of the documentation.

[6] Hay sales will not occur each month both because that is the nature of agriculture and because Counsel is trying to sell the land. But perhaps more significant is how this revenue illustrates the conflicting allegations that Counsel makes in this case. In the motion for Court approval of his proposed sale of the Hockley Property, Counsel contends that he has full ownership of the land and that Debtor has retained no interest in the property. But it is

Schedule J forecasts Debtor's average monthly living expenses to be about $6,700. The June monthly operating expense show cash disbursements from June 17 through June 30 of about $5,800 and the July report shows cash disbursements of about $5,000. The favorable difference between forecast in Schedule J and the actual expenditures reported in the monthly operating reports appears to result from Debtor not making debt payments.

In summary, Debtors recurring expenses (net of debt service) appear to be approximately $2,000 per month more than recurring monthly income. The monthly operating reports indicate that Debtor has funded the deficit through June and July by spending cash that was on hand at the commencement of the case. That cash is now exhausted and Counsel could not tell the Court how Debtor would (or could) fund the August deficit.

      a. The Application to Employ

In docket # 12, Debtor asks to employ Counsel as his attorney in this bankruptcy case. The transfer of the Hockley Property is disclosed in the application and in other appropriate places. The US Trustee objected to the request for Court approval of engagement of Counsel. A hearing was held on September 1, 2010.

      b. The Motion to Sell the Hockley Property

On August 30, in docket ## 33 and 34,[7] the Debtor asked for emergency Court approval for Counsel to sell the Hockley Property. The motion alleges that:

> The Debtor did not retain any interest in the Property other than the agreement that the net proceeds from the sale, after reimbursement to Baker of all amounts paid by Baker on the Property, would be held in a trust account for the benefit of the Debtor in the bankruptcy case…
>
> The Debtor does not own an interest in the Property. However, due to the interest of the Debtor in the net proceeds, the Debtor seeks approval from this court of the sale.
>
> The sales price is <u>approximately</u> $250,000… [Emphasis supplied.][8]
>
> Since Baker is representing the Debtor in the chapter 11 case, Baker desires that the sales transaction on the Property be

---

clear that is not correct because almost half of Debtor's July income came from farming operations on the land which Counsel claims that Debtor does not own and as to which Counsel claims that Debtor has retained no rights.

   [7] The motion to sell and the motion for expedited hearing repeat many of the same allegations. The Court will refer to the, combined, as if they were a single motion.

   [8] The exact sale price was never disclosed.

>approved by this court, even though Baker is the owner of the Property.

The motion does not attach a copy of the proposed sale contract, although it offers to make a copy available on request. The motion does not disclose the marketing process, except to state that a broker was involved. The motion does not disclose the name of the purchaser, but does state that the purchaser is not "related" to Debtor or to Baker. The motion states that "Baker has paid additional amounts to the holder of the deed of trust lien", but does not state the purpose of the payments or how much was paid. Nevertheless, the motion requests Court approval for Counsel to sell and to withhold from the sales proceeds all sums to which Counsel is entitled, whatever that might be. To be clear, Court approval is requested despite failure to disclose the exact sales' price, the contract for sale, the identity of the purchasers, and the amount that will be withheld prior to treating the remainder as retainer.

The motion states that the Debtor will pay the broker's fees and normal closing costs that a seller would pay. Presumably the motion meant to say that Counsel would pay these costs out of the sales' proceeds. The name of the broker and the amount of the brokers' fee is not disclosed.

The motion was filed August 30, and requested consideration on one day's notice; Counsel requested that the motion to sell be heard concurrently with other matters previously scheduled in the bankruptcy case for hearing on September 1. The motion requests consideration on short notice because the motion alleges that the sale was scheduled to close "by the end of August." It is not clear how a hearing on September 1 could authorize a sale "by the end of August."

The order that Counsel proposed to the Court would have authorized Counsel to retain from the sales' proceeds "sums advanced by Baker on the Property after the transfer of the Property to Baker" and "his fees and expenses of $10,913.95 for pre-petition fees and expenses." The title company would have been authorized to pay liens against the property and customary closing costs and attorneys fees. The remainder was to be paid to Counsel as a retainer in the bankruptcy case.

At the hearing on September 1, Counsel reported that the sale had fallen through because Court approval had not been obtained in time.

ANALYSIS AND CONCLUSIONS OF LAW

The Debtor in this case is a debtor in possession. Bankruptcy Code § 1107 gives a debtor in possession the rights, duties, and powers of a trustee. Bankruptcy Code § 327 provides that a trustee, with the court's approval, may employ an attorney that does not hold or represent an interest adverse to the estate and that is disinterested. Bankruptcy Code § 101(14) states that the term "disinterested person" means a person that is not a creditor.

1. Counsel is not disinterested

On the date that the filing of the bankruptcy petition commenced this bankruptcy case, Counsel held claims against Debtor, amounting to about $21,000, and those claims still exist. Not only has Counsel not waived those claims, in the motion to sell he asked the Court to authorize the payment of these claims post-bankruptcy. Counsel is a creditor. Counsel is not disinterested.

2. Counsel holds an adverse interest

Counsel agreed with Debtor and with Doty to advance monthly note payments during the course of the case and then to pay the debt in full from the sale proceeds. The Court knows of no agreement that details or limits Counsel's obligation. Is Counsel obligated to make those note payments until November? Or may Counsel simply abandon the property if he ceases to believe that the property has value in excess of the secured claim? If Counsel does not get an offer to purchase before November, is Counsel obligated to pay off the Doty note to preserve whatever equity is in the property? Is Counsel obligated to pay insurance premiums to protect the property? In case of damage or threat to the property from weather or other cause, is Counsel obligated to protect the property? In all of these circumstances, and probably many others, the rights and obligations of Counsel and Debtor are poorly defined, or undefined, and Counsel's interests and Debtors are adverse.

3. Texas Disciplinary Rules of Professional Conduct

The lawyer-client relationship in this case commenced May 11, 2010. The sale of the land to Counsel occurred June 1, 2010.

Rule 1.08(a) provides:

> (a) A lawyer shall not enter into a business transaction with a client unless:
>
> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed in a manner which can be reasonably understood by the client;
> (2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
> (3) the client consents in writing thereto.

The Court concludes that subparagraph (1) was not satisfied. The ambiguity of the agreement, alone, is fatal to compliance with this rule. But more important, the Court questions the fairness and reasonableness of the "sale" of the property. That sale removed from the estate the only asset of any apparent or immediate value. Without the $110,000 equity in the Hockley Property, Debtors are apparently unable to pay monthly living expenses. It is difficult to understand how it is fair to build a substantial legal retainer while the client cannot pay the grocery and electric bills. Less serious, but still of questionable fairness, is the removal of virtually all the non-exempt property from this estate to fund a retainer. The potential for reorganization is seriously reduced, if not eliminated.

In addition, there is no indication that subparagraph (2) was satisfied.

Rule 1.08(d) prohibits providing financial assistance to the client. Therefore, Counsel's agreement to pay the monthly Doty note and Counsel's payment of $10,000 to defer foreclosure is also questionable.

## CONCLUSION

For the preceding reasons, the Court denied the application to employ counsel.

SIGNED 09/09/2010.

*Wesley W. Steen*
Wesley W. Steen
United States Bankruptcy Judge